THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES MURPHY, Defendant-Appellant.

First District (3rd Division)   No. 84—1582

Opinion filed June 10, 1987.

McNAMARA, P.J., dissenting.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Joan Disis, and Gail Feiger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Defendant James Murphy, charged with the murder of Donald Bolden and having conceded that he committed the homicide, pled not guilty by reason of insanity and, alternatively, that the act was committed in self-defense. At trial, the jury heard the contents of a report of defendant's social history prepared by the Cook County Psychiatric Institute shortly after the incident; that report contained statements from defendant's mother indicating that he had quarreled with his family before the incident and that she believed defendant's actions to be a response to the quarrel, not a result of insanity or an attempt at self-defense. In closing argument, the prosecutor used the mother's statement as substantive proof that defendant's actions were caused by rage at the family dispute and were not a result of insanity or an attempt to defend himself. Defendant was found guilty of murder but mentally ill and sentenced to a 30-year prison term. We reverse.

On July 3, 1979, police officers responded to a report of a man with a knife, and *en route* to the reported address, saw defendant carrying a knife and chasing the victim. By the time an officer had left his squad car and approached the scene on foot, the victim was leaning against a car. As defendant was being disarmed and handcuffed, the victim collapsed; he died of internal bleeding from a single stab wound. Defendant said that the victim had been "picking on" him and had struck him with a baseball bat.

Defendant underwent a series of psychiatric examinations to determine whether he was fit to stand trial. Dr. Robert Reifman, who initially examined defendant, concluded that he was both fit to stand trial and sane at the time of the offense. However, on the basis of subsequent testing by Dr. Marvin Ziporyn which indicated mental retardation and paranoid personality, the court found defendant unfit for trial on January 14, 1981, and placed him in the custody of the Department of Mental Health and Developmental Disabilities. The department provided the court with updates on defendant's condition,

reporting in April 1981 that defendant remained unfit and in July 1981 that he was still unfit and unlikely to attain fitness by January 1982. However, on September 2, 1981, counsel for both the prosecution and the defense stipulated that two psychiatrists had examined defendant and found him fit for trial, and the court entered a finding of fitness in accord with that stipulation.

At trial, an assistant State's Attorney questioned psychiatrists for the prosecution and defense about a report of defendant's social history prepared by a Cook County Psychiatric Institute employee. That report included a conversation with defendant's mother which allegedly revealed the occurrences immediately before the homicide:

"MR CRONIN [prosecutor]: Have you read that report?

DR. ZIPORYN [defense witness]: This report?

Q. Yes, from Yvonne Stevens.

A. I just read the last paragraph, where she says the defendant is a schizophrenic, paranoid-type, with mild retardation—

Q. There is no question pending. I'm directing your attention to the middle of the first paragraph, after 'arrest.' Doctor, are you aware that Mrs. Hill stated about her son on the night that he was arrested: 'Later patient came home intoxicated. He asked his mother for money. She refused him, and he became very angry and belligerent. His seventeen-year-old sister intervened, told the patient that she was going to get some boys to beat him up. The patient again got a butcher knife and was going to cut his sister. She ran into [a] closet. The mother tried to take the knife from the patient. He knocked her down and ran out of the house with the knife. The mother then had the daughter call the police.'

Are you aware of that?

A. Yes, sir, I was aware of that situation.

Q. Are you aware that she feels—this is the mother talking to Yvonne Stevens—that it was a coincidence that the victim was on the street when the patient ran out of the house angry and upset with the knife. Are you aware of that?

A. Yes."

Dr. Reifman, testifying for the prosecution, made more general reference to the report in revealing the basis for his determination that defendant was sane.

During closing argument, the prosecution again raised the allegations of the report:

"MR. CRONIN [prosecutor]: Was Donald Bolden in that

apartment when he started attacking his mother? Was Donald Bolden in that apartment?

MR. KLING [defense counsel]: I'll object, there's no evidence as to what the State is arguing. It was information in a report. There was no testimony in court. It was the basis of opinions. There's no evidence that that occurred.

THE COURT: Overruled. You may comment on the evidence.

MR. CRONIN: He got mad and grabbed this knife. Did he grab this knife to go out and defend himself? Use your common sense. He grabbed this knife to go out on the street and to wreak havoc.

\*\*\*

James Murphy was angry and James Murphy was going to use this knife and he didn't care who he was going to use this knife on, and who did he use it on? Donald Bolden."

In his summation, Assistant State's Attorney Locallo made further reference to the statement of defendant's mother: "You have information from the mother to a psychologist about what really happened on July 3, 1979, we submit. We submit what really happened is he wanted money, he got angry, went after his mother, went after his sister. When he couldn't get at them, he left with the butcher knife."

■■ The statements from defendant's mother about "what really happened" were inadmissible hearsay. Hearsay is an out-of-court statement which is offered to prove the truth of the matter asserted therein and dependent for its value on the credibility of the out-of-court declarant. (*People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223.) In the instant case, the unsworn, out-of-court statement of defendant's mother, who did not testify at trial, was offered as proof that defendant killed the victim not in self-defense or as a result of insanity, but because he was angry and wanted money. The probative value of the mother's statement is certainly dependent on her credibility, which was not tested by the trier of fact. Indeed this case involves a second level of hearsay, since Yvonne Stevens, who allegedly heard the mother's statement, also did not testify and thus was yet another out-of-court declarant whose credibility and accuracy in recording the statements of defendant's mother the trier of fact had no opportunity to judge. Because the jury was allowed to examine neither the mother's accuracy in recounting the events before the incident nor the social worker's accuracy in recording the mother's statement, that statement was hearsay and its admission was error.

The State contends that our supreme court's holding in *Wilson v.*

*Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, which expressly adopted Federal Rule of Evidence 703, established the admissibility of statements such as those at issue here. We disagree. Although *Wilson* did hold that experts may base their opinion testimony on facts not ordinarily admissible, and later decisions have allowed experts to disclose the underlying facts to the jury (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485), those decisions stress that the facts must be of a type reasonably relied upon by experts in the field: "[T]he key element in applying Federal Rule 703 is whether the information upon which the expert bases his opinion is of a type that is reliable." *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193, 417 N.E.2d 1322. The *Wilson* court ruled that hospital records, because of their inherent reliability and their common use as reference materials by medical experts, need not be authenticated by each person who played a part in their creation.

We find no basis for equating hospital records with the statements at issue in the instant case. Unlike hospital records, which are presumed to be routine, professional reports of objective data, the declarations of defendant's mother were singular, subjective interpretations of defendant's actions and mental state. This is the kind of inherently unreliable testimony that the hearsay rule was designed to exclude; therefore, we are unable to call such testimony sufficiently reliable to qualify for the hearsay exception of *Wilson*. Without the necessary showing of reliability, this court has ruled such testimony inadmissible. (*People v. Maisonet* (1985), 138 Ill. App. 3d 716, 719, 486 N.E.2d 277.) We consider the same result to be appropriate here. In addition, we question the State's reliance upon *Wilson* under the particular circumstances of the case at bar: the declarations whose admission the State defends were read in detail by the prosecution during cross-examination of an expert witness who indicated that he had not relied upon them in making his diagnosis. *Wilson* and its progeny create a hearsay exception for reliable data that experts have used to reach their conclusions, but we doubt that this exception can be invoked by prosecutors who wish to introduce data that have not formed the basis of expert opinion.

■ Even should we accept the State's assertion that the statement of defendant's mother was admissible as the basis of expert opinion, we believe that the prosecution made improper use of that statement during closing argument. In *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659, this court warned that facts admitted as the basis of expert opinion could not be presented to the jury as substantive evidence of the underlying assertions:

"[I]t should be noted that prosecutors have recently begun to take improper advantage of the admissibility of such evidence by ostensibly offering it for the limited purpose, and, once it is admitted, making impermissible use thereof in closing argument [citation], and we would warn that this conduct is improper and, in flagrant cases, may lead to reversal [citation]. If the State indeed intends to use it for the limited purpose permitted, the prosecutor should confine his arguments to that purpose, and any improper use should not be tolerated." (124 Ill. App. 3d 516, 530-31, 464 N.E.2d 659.)

In that case, the defendant's conviction was not reversed because "there was only a single improper reference to which the trial court sustained defendant's objection and further admonished the jury that the content of the conversation *** was not in evidence and was not to be considered by them." (124 Ill. App. 3d 516, 531, 464 N.E.2d 659.) In the instant case, however, the trial court overruled defendant's objection and told the prosecutor that he could "comment on the evidence." The jury then heard two additional references to the mother's statement. We believe this to be the kind of flagrantly improper argument mentioned in *Hunter*. Since the trial court added to the suggestion that the mother's statement was evidence that could be considered by the jury, and since the statement was mentioned at least three times by the prosecution, the grounds for affirming the trial court's decision in that case are absent here.

■■ ■ The State correctly argues that defendant failed to preserve for review the issues concerning his mother's declaration by failing to object when the statement was first introduced at trial and by failing to include either the introduction or subsequent use of the statement in his motion for new trial. However, according to Supreme Court Rule 615(a) (87 Ill. 2d 615(a)), we may consider such issues if they affect substantial rights in criminal cases. It is appropriate to do so in cases where the evidence is closely balanced or in cases where the magnitude of the error denies the accused a fair and impartial trial. (*People v. Maisonet* (1985), 138 Ill. App. 3d 716, 719, 486 N.E.2d 277.) Such a situation is presented in the instant case. Given defendant's troubled mental history, the conflicting reports of the psychiatrists who examined him before trial, and the agreement on the part of all that defendant did suffer from a mental defect, we think it clear that the evidence presented to the jury a close question of whether to reach a verdict of guilty but mentally ill or not guilty by reason of insanity. In such a close case, the prejudicial effect of a contradiction of defendant's story by his own mother cannot be ignored. We therefore

hold that the introduction and later substantive use of the mother's out-of-court statement requires reversal of defendant's conviction despite the failure to preserve the issues for review.

■ Because it is likely to be raised at retrial, we address an additional issue argued by defendant. At trial, a State psychiatrist twice testified that he had found defendant to be sane at the time of the offense because after his arrest, he had remained silent when informed of his right to do so. A copy of the rights read to defendant at the time of his arrest was submitted to the jury over defense objection. This was error. Our supreme court, following the United States Supreme Court precedent of *Wainwright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634, has ruled that a criminal defendant's invocation of his constitutional right to remain silent after his arrest cannot be introduced as evidence rebutting his claim of insanity. (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485; *People v. Stack* (1986), 112 Ill. 2d 301, 493 N.E.2d 339.) Such evidence should not have been introduced in the case at bar.

For the foregoing reasons, we reverse defendant's murder conviction and remand the cause to the circuit court for retrial.

Reversed and remanded.

RIZZI, J., concurs.

PRESIDING JUSTICE McNAMARA, dissenting:

I respectfully dissent from the majority holding which reverses defendant's conviction. I would affirm the conviction. The statements made by defendant's mother, Jeanette Hill, constitute relevant non-hearsay evidence of defendant's mental state at the time of the murder. The prosecutor's comments on this evidence in closing argument were not improper. Furthermore, the prosecutor properly examined the psychiatric experts using Hill's description of defendant's mental state and the Psychiatric Institute intake report, both of which fall within the types of information reasonably relied upon by psychiatrists in forming opinions regarding insanity.

In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, our supreme court adopted, without reservation, Rules 703 and 705 (Fed. R. Evid. 703, 705). Under Rule 703, an expert may base an opinion upon facts or data which need not be admissible in evidence, but only if the facts are of a type reasonably relied upon by experts in that particular field in forming opinions upon the subject. Under Rule 705,

an expert may testify as to an opinion without prior disclosure of the underlying facts, but disclosure of the basis may be required during cross-examination.

The majority bases its Rule 703 analysis on the incorrect premise that Rule 703 is an exception to the hearsay rule. The majority holds that Hill's statements reflect the kind of testimony "that the hearsay rule was designed to exclude," and therefore the statements cannot "qualify for the hearsay exception of *Wilson.*" Rule 703, however, is not an exception to the hearsay rule. (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485, *cert. denied* (1986), 479 U.S. ____, 93 L. Ed. 2d 713, 107 S. Ct. 658.) Rule 703 functions much like a hearsay exception in some practical aspects. Unlike evidence admitted under a hearsay exception, however, the contents of reports relied upon by an expert are not offered for their truth and may be disclosed only for the limited purpose of explaining the basis of the expert witness' opinion. *People v. Anderson* (1986), 113 Ill. 3d 1, 495 N.E.2d 485; *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322; *Mayer v. Baisier* (1986), 147 Ill. App. 3d 150, 497 N.E.2d 827; see also Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness,* 1986 U. Ill. L. Rev. 43.

The key, then, is whether the facts underlying the expert opinion are of a type reasonably relied upon by experts in the particular field. This inquiry involves the review of several factors, and whether the underlying information is hearsay is only one of the factors to be considered. The trustworthiness of the underlying facts should be at least the equivalent of evidence admitted under a hearsay exception. (See Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness,* 1986 U. Ill. L. Rev. 43.) In the present case, Hill's statements are at least equal to the reliability of a hearsay exception because her statements are non-hearsay.

The majority finds that Hill's statements are "inherently unreliable" and inadmissible hearsay. Hill's statements, however, were not offered for the truth of the matter asserted. The statements were not offered as proof, *e.g.*, that defendant actually asked his mother for money; that defendant attempted to harm his sister; that his sister hid in a closet; that defendant knocked his mother down; or that he left home with a butcher knife. The police found defendant holding the knife as he stood next to the victim, who collapsed on the street with a fatal chest wound. The only issues at trial concerned defendant's mental state, *i.e.*, both his belief that self-defense was necessary

and his sanity.

Statements made out of court are not hearsay where they are not offered for their truth, but instead are offered to show defendant's mental condition. (*People v. Williams* (1967), 38 Ill. 2d 115, 230 N.E.2d 224; *People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207; *People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609, *cert. denied* (1983), 464 U.S. 841, 78 L. Ed. 2d 130, 104 S. Ct. 136; *People v. Muskgrove* (1976), 44 Ill. App. 3d 381, 358 N.E.2d 336.) Thus, Hill's out-of-court statements were circumstantial proof of defendant's mental state rather than proof of the literal truth of Hill's assertions. See *People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609; *People v. Ortiz* (1978), 65 Ill. App. 3d 525, 382 N.E.2d 303.

Another factor to be considered is the relevance of the material to be disclosed. An expert must be permitted to repeat contents of reports upon which he has relied if they are relevant to explaining his opinion to the jury. (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.) When defendant relies on the theory of self-defense, his state of mind at the time of the incident is a material issue. *People v. Ortiz* (1978), 65 Ill. App. 3d 525, 382 N.E.2d 303.

In addition, when sanity is an issue at trial, evidence of defendant's mental state is crucial. (*People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609.) " '[A]ny and all conduct of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue.' " (*People v. Vanda* (1982), Ill. App. 3d 551, 556, 444 N.E.2d 609, quoting 2 Wigmore, Evidence sec. 228, at 9 (Chadbourn rev. ed. 1979).) Where the accused's sanity is in dispute, the trial court should allow great latitude in admitting evidence regarding his mental condition. In the present case, the alternate theories of insanity and self-defense depended completely on evidence tending to show defendant's mental state at the time of the occurrence.

Another factor indicative of the reasonableness of an expert's reliance on the underlying material involves an inquiry regarding the particular field itself. The nature of the field of psychiatry necessitates the use of materials such as social history reports containing facts reported by the patient's family. (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485; *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) One purpose of Rule 703 is to bring the judicial practice into line with the practice of the experts themselves when not in court by recognizing that data relied upon by the experts may be derived from nu-

merous sources of considerable variety, including statements by relatives and reports by other professionals in related fields. See Fed. R. Evid. 703, Advisory Committee Note, at 11 (1982); *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.

Unquestionably, psychiatrists may rely on reports of other health professionals. (*People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485; *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) A psychiatric case history is essential to effective mental health treatment and a psychiatrist might often have a specially trained social worker compile a social history report after a thorough investigation into all possible sources, including relatives of the patient. (See Comment, *The Admissibility of Expert Medical Testimony Based in Part upon Information Received from Third Persons*, 35 S. Cal. L. Rev. 193, 205, n. 77 (1962).) In addition, the psychiatric profession necessarily relies on information given by family members or other third persons. *United States v. Lawson* (7th Cir. 1981), 653 F.2d 299, *cert. denied* (1982), 454 U.S. 1150, 71 L. Ed. 2d 305, 102 S. Ct. 1017; see generally Diamond and Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations and Speculations*, 63 Mich. L. Rev. 1335 (1965), cited in *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.

The majority, I believe, confuses the dissimilar fields of psychiatry and medicine relating to physical illnesses. It finds "no basis for equating hospital records" or "routine, professional reports of objective data" with the types of statements made by Hill. Rule 703, however, restricts the reasonable reliance analysis to materials relied upon by experts in that particular field. The majority has ignored the needs and methods unique to the field of psychiatry, despite the numerous Illinois decisions highlighting these elements. See, *e.g., People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171, (1985), *cert. denied* (1985) 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410 (psychiatrist relies on interviews with defendant's relatives; court notes it is obvious that a psychiatrist would require more than a mere physical examination in order to reach a conclusion as to his sanity or insanity); *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171 (psychiatrist partially bases his opinion regarding defendant's sanity on report given to social worker by defendant's mother); *In re Germich* (1981), 103 Ill. App. 3d 626, 431 N.E.2d 1092 (psychiatrist bases opinion partially on information from patient's father; court finds psychiatrists customarily rely on intake staff's report); *People v. Sharkey* (1978), 60 Ill. App. 3d 257, 376 N.E.2d 464 (psychiatric expert relies on statement from mother; court finds such statements are necessary to treat patient).

A further indication of the trustworthiness of the experts' opinions is the fact that the psychiatric profession itself deems such underlying material reliable. (See *United States v. Sims* (9th Cir. 1975), 514 F. 2d 147, *cert. denied* (1975), 423 U.S. 845, 46 L. Ed. 2d 66, 96 S. Ct. 83; *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.) Based on years of experience, the expert learns to use only sources of information which are of a type reasonably relied upon by his colleagues in arriving at opinions; consequently, the expert is fully capable of judging for himself what is a reliable basis for his opinion. (*United States v. Sims* (9th Cir. 1975), 514 F.2d 147.) The psychiatrist is aware that information provided by a patient's family may be distorted and incomplete. The psychiatrist is especially trained to sort through the information, evaluate it, determine the weight of each fact or opinion, and arrive at a conclusion. (See Diamond and Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations and Speculations*, 63 Mich. L. Rev. 1335 (1965).) A court should not substitute its opinion for the experts' opinions as to what is reasonably relied upon by other experts in that particular field. See *Mannino v. International Manufacturing Co.* (6th Cir. 1981), 650 F.2d 846.

In addition, I believe the majority confuses questions of admissibility and weight. Our supreme court has held that it is "illogical and anomalous to deprive the jury" of the reasons supporting the expert's opinion. (*People v. Anderson* (1986), 113 Ill. 2d 1, 10, 495 N.E.2d 485, citing *United States v. Harper* (5th Cir. 1971), 450 F.2d 1032.) The majority finds that Hill's statements are "singular, subjective interpretations of defendant's actions and mental state." This is a question of weight for the jury. (See *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485.) I believe the majority errs in severely restricting the bounds of the jury's inquiry into the defendant's mental state at the time of the crime. See *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485; *People v. Wright* (1985), 111 Ill. 2d 128, 490 N.E.2d 640.

Additionally, the majority ignores the fact that Rules 703 and 705 were designed so as to place a heavy burden on the cross-examiner to probe the basis of an expert's testimony. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322; see generally, M. Graham, Cleary & Graham's Handbook of Illinois Evidence sec. 705.1, at 494 (4th ed. 1984).) The expert can be cross-examined as to the weight he gave any materials or statements, and his reason for relying on them. (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) The parties can fairly apprise the jury of the sources of information forming the basis of the expert opinion. *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485; *People v. DeWit* (1984), 123 Ill. App. 3d 723, 463 N.E.2d 742.

The majority also questions the State's reliance upon *Wilson v. Clark* because the State cross-examined the defense expert, who did not rely on Hill's statements in forming his opinion as to defendant's sanity. The majority incorrectly reasons, "[W]e doubt that this [hearsay] exception can be invoked by prosecutors who wish to introduce data that have not formed the basis of an expert opinion." 157 Ill. App. 3d at 119.

A cross-examiner often probes the basis of an expert's opinion by altering the facts upon which the expert actually relied. One commentator has noted that if the additional fact "has been or will be reasonably relied upon under Rule 703 by an expert called as a witness by the cross-examiner," the cross-examination is proper. (Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness*, 1986 U. Ill. L. Rev. 43, 70.) In the present case, the prosecutor called as witnesses Drs. Reifman and Stipes, who both testified regarding their reliance on the Psychiatric Institute report. Moreover, the defense expert, Dr. Ziporyn, testified that he read police reports which included statements by defendant's family, and he was aware of Hill's statements because he read them in Dr. Reifman's report. I would hold that the fact that Dr. Ziporyn may not have relied on the social history report did not prevent the trial court, in its discretion, from permitting cross-examination of Dr. Ziporyn regarding the report in order to explore the strengths and weaknesses underlying his opinion.

The majority finds further that the evidence of Hill's statements was used improperly in closing arguments. I disagree. The prosecutor merely commented on the statements only within the limited purpose for which they were admitted, *i.e.*, as evidence of defendant's mental state.

Finally, the majority holds that it was error to permit a State psychiatrist to testify that he partially based his opinion that defendant was sane on the fact that after defendant's arrest he remained silent when informed of his right to do so. This alleged error was not raised at trial or in the post-trial motion and thus was waived. Moreover, any error was harmless because the issue was never argued to the jury.

For these reasons, I would affirm defendant's conviction.